Opinion issued December 3, 2009




 

 






In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-09-00119-CR

____________


JEREMIAS FUENTES, Appellant


v.


THE STATE OF TEXAS, Appellee






On Appeal from the 182th District Court

Harris County, Texas

Trial Court Cause No. 1143046







MEMORANDUM OPINION

 A jury convicted appellant, Jeremias Fuentes, of murder and assessed
punishment at 85 years in prison and a fine of $10,000. Tex. Penal Code Ann. §
19.02(b) (Vernon 2003). In three points, appellant contends that (1) the trial court
abused its discretion by admitting hearsay testimony and written statements of the
decedent, (2) the trial court erred by denying requested jury instructions on defense
of a third person, and (3) the trial court failed to include a voluntariness instruction
in the jury charge pursuant to Article 38.22, Section 6 of the Texas Code of Criminal
Procedure, resulting in egregious harm to appellant. We affirm.

Background


 Katherine Bridges, the complainant, was a deaf-mute woman who resided with
appellant as his common-law wife for approximately four to five years. The couple
had two children: a three-year-old son and a two-year-old daughter. Bridges was deaf
as the result of a syndrom, which caused her to be born without ears. Despite her
disability, Bridges functioned normally and communicated by signing. 

 At the beginning of the trial, the jury heard a recording of a 911 call placed by
Alma Fuentes ("Alma"), the niece of appellant. The call was placed at 4:45 p.m. on
November 25, 2007. In the call, Alma told the 911 operator that appellant called her
saying he killed his wife. 

 Alma testified that she received two phone calls from appellant between 4:00
and 5:00 p.m on November 25, 2007. During the first call, appellant said that he was
at Bridges' apartment and asked Alma to pick up his children because he and Bridges
were having issues. Alma refused because she did not want to get in the middle of
the couple's issues. Instead, she insisted that appellant return to her home because
appellant was not supposed to be at Bridges' apartment. Appellant had been staying
at Alma's home that weekend because of a previous conflict with Bridges. 

 After getting off the phone with appellant, Alma started to worry. Alma and
her husband tried to call appellant several times but he did not answer. Alma decided
to drive to Bridges' apartment. As she was pulling into the parking lot of the
complex, appellant called her again. This time, he sounded different and was
speaking very slowly. Appellant told Alma, "Don't leave my babies alone," and said
he was "dying." When Alma asked about Bridges, appellant said his wife was dead
and that "[h]e killed her." Alma testified that appellant never indicated that Bridges
had hurt him physically.

 After hanging up on appellant, Alma called 911 from her cell phone. Alma
relayed her conversation with appellant to the operator. Alma searched for the
apartment while on the phone. Alma heard children making noise and saw
appellant's children on the balcony of a second floor unit. When Alma opened the
front door to the apartment, the older child, Junior, was crying, screaming, and trying
to communicate using sign language. Junior was saying, "Mommy, Poppy," while
holding his neck and pointing to the sofa. 

 Alma looked around the apartment and did not see appellant or Bridges. She
found that the back bedroom door was locked. Believing appellant and Bridges were
inside, Alma forced the door open. She walked into the room and saw appellant's
foot sticking out of the closet, so she ran towards the closet. Alma found both
appellant and Bridges lying on the floor in the closet. Appellant was lying with his
head on Bridges' stomach. Alma testified that Bridges was "face up," and described
her appearance as "[c]ompletely white. Like she was sleeping, but she was different. 
Her face was white, white, with her mouth open." Alma noticed appellant's stomach
moving up and down "like he was breathing." Alma left the bedroom immediately
because Junior had followed her, and she "didn't want him to see his daddy and
mommy like that." 

 Deputy Kelly Espinoza, with the Harris County Sheriff's Office, testified that
he arrived at the apartment around 4:52 pm. Upon entering the apartment, Alma
pointed her in the direction of the bedroom. Deputy Espinoza saw appellant lying on
the floor of the bedroom; she said that one of the other responding officers had pulled
him from the closet so that he could be treated by paramedics. Deputy Espinoza
described appellant as "nonresponsive," adding "he wasn't responding to [the
officers] when [they] were trying to ask him questions," but, as far as she could tell,
he was conscious. Appellant had "three puncture wounds to the left side of his chest
in the pectoral area," but the wounds did not appear to be bleeding much. Deputy
Espinoza saw Bridges on her back in the closet. Bridges was "very pale" and
"appeared to have been deceased for quite some time." 

 Two bloody knives were found in the bedroom: a "large steak knife" in the
baby's crib and a "butcher knife" in the closet laying on Bridges' body. One of the
knives appeared lay near Bridges' hand; the knife was laying across her shoulder with
the handle near her hand and the blade pointed towards her elbow. Deputy Espinoza
testified that Bridges did not appear to be holding the knife; "it appeared to have just
been laying there."

 Deputy Espinoza secured the scene and permitted two paramedics to enter the
room to treat appellant. The medical personnel took appellant to the hospital by
LifeFlight. However, Deputy Espinoza testified that she did not believe LifeFlight
was necessary because appellant was making responsive gestures, such as clinching
his jaw shut, and his wounds did not appear to be bleeding much. 

 The medical examiner discovered that Bridges suffered eleven stab wounds,
three to the chest, two to the back of her left arm, four on her back, one to the back
of her neck, several to her right wrist and hand, and one wound on the side of her
head. She also had facial abrasions and blunt force injuries that occurred near the
time of her death. Bridges bled to death from her stab wounds, some of which
punctured her lungs. 

 Crime scene investigators also testified at trial. DNA testing revealed that each
of the swabs of blood police recovered from the closet contained DNA consistent
with Bridges' DNA, except for one. The crime scene officer also noticed that there
was no sign of a struggle in the bedroom, and he found only a minimal amount of
blood on appellant's pants. 

 Appellant made two separate statements to police officers regarding the
incident. The first was in the early hours of the morning following the night of the
incident. The second interview was on December 2, 2007, after being placed under
arrest for murder. Translations of both interviews were read aloud to the jury.

 The first statement was taken at the hospital at around 3:00 a.m. on November
26, 2007. Two detectives, Deputies Quintanilla and Reynolds, went to the hospital
to speak with appellant about the incident. Appellant was not under arrest at that
time. Before speaking with appellant, the detectives ascertained from his nurses that
he was able to speak and was not sedated. Because appellant did not speak English,
Deputy Mario Quintanilla spoke to him in Spanish. Deputy Quintanilla testified that
he asked appellant if he was willing to talk with them, and appellant agreed and was
cooperative. Deputy Quintanilla had no problem communicating with appellant and
testified that appellant appeared to understand him. Deputy Quintanilla made an
audio recording of his conversation with appellant, which lasted just over an hour. 

 In the first statement, appellant explained that, before the incident, he went out
to eat and run errands with his two children and Bridges. When they returned, he
instructed Bridges to put on a movie for their children to watch. He said he wanted
to gather some clothes to take to Alma's apartment where he was staying, but Bridges
refused to let him take his belongings from the apartment. He said the couple argued
about property in the apartment and a claim that appellant had previously threatened
Bridges with a knife. Appellant claimed that he had not pulled a knife to threaten her,
but rather, he was peeling an apple for his daughter. Appellant said that Bridges told
him she was an American and could kill him for being in her apartment as she held
up a knife. He said he attempted to calm her down, but she stabbed him in the neck. 
However, later in the interview, he said she stabbed him in the chest. Appellant said
he was "spilling blood." Appellant said he ran to where the knives were kept, but
they weren't there. He said he found the knives in a different location from where
they were usually kept. He got a knife and returned to the couple's bedroom. 
Appellant stated that he locked the door so the children would not see them, and the
couple "went after [each other] inside" the bedroom. He said each of them had a
knife, but his was shorter. Appellant said that he told Bridges, "You know what,
[K]atherine? We started it now we're going to finish it. Let's kill each other." He
said he "totally lost control" because seeing his own blood "drove [him] out of [his]
mind[.]" Appellant admitted he stabbed Bridges repeatedly in the back while she was
in the closet. He explained that after Bridges saw that appellant was bleeding a lot,
she ran into the closet to hide, and that is when appellant stabbed her in the back. 
Then, he said he called Alma for help, telling her he had just killed Bridges. 
Appellant admitted he stabbed himself in the chest. He explained if he did not stab
himself, and he survived, it was "going to be big trouble." But, appellant said that he
did not have the courage to kill himself on his own. He said Bridges caused only one
of the wounds on his chest.

 The second interview was taken by the same officers on December 2, 2007. 
At that point, appellant had been released from the hospital and was under arrest for
the murder of his wife. A video recording of the interview was made and offered into
evidence at the trial. Prior to the interview and on the video recording, appellant was
read his Miranda rights. Appellant acknowledged that he understood his rights and
willingly spoke with the deputies. 

 Appellant's second statement was fairly similar to his first statement, but he
added details. In his the second statement, appellant claimed Bridges called him to
the bedroom to take his clothing and belongings, and he noticed she had a knife. 
Appellant claimed that he told Bridges to cut him if she had the courage, but he said
that he did not believe she would really stab him. Appellant said Bridges stabbed him
twice, and he realized she meant to kill him. Appellant said that, if he left the
apartment, Bridges would kill the children, so he ran to the kitchen to retrieve a knife. 
When appellant returned to the bedroom, Bridges was in the closet holding the closet
door shut from the inside. He forced the door open to get to her. When asked why
he did not flee with the children, call the police, or ask for help from a neighbor,
appellant said he could not leave the bedroom because it would traumatize his
children to see him bleeding. Deputy Quintanilla confronted appellant with his
statement that he left the bedroom to get a knife. Also, Deputy Quintanilla
confronted appellant with information that police did not recover any of his blood in
the apartment living room or kitchen, which disproved his claim that he left the room
to get a knife after Bridges stabbed him. Appellant claimed that he used his shirt to
control the flow of blood. However, police never recovered a bloody shirt from the
apartment. Appellant claimed he threw Bridges' knife into the closet, but police
recovered it lying on her arm. He could not explain why police found the knife
resting on her arm. 

 Appellant's hospital records were introduced into evidence, showing he had
three stab wounds clustered together on his left shoulder. The hospital records also
reflected that he "stabbed [his] wife and then himself."

 The jury returned a verdict finding appellant guilty of murder. During the
punishment phase, the State introduced records of appellant's three prior convictions. 
Specifically, appellant pleaded no contest to assaulting Bridges, a member of his
family, by kicking her on October 7, 2004. Additionally, appellant pleaded no contest
to interfering with an emergency telephone call placed by Bridges on October 7,
2004. And most recently, he pleaded guilty to interference with the duties of a public
servant on August 4, 2007 for refusing to leave and let emergency medical services
interview Bridges about a domestic violence assault. 

 Appellant took the stand during the punishment phase. He testified to his
relationship with Bridges. Appellant testified that Bridges was eighteen years old
when they met. He was thirty-one years old at the time. In the beginning of the
relationship he said they were "very much in love." He testified that the problems
started in October 2004, explaining he went out of state for three weeks for a
construction job, and when he returned, Bridges had a boyfriend. Appellant said that
he and Bridges got in an argument, and as a result of the argument, she told the police
that appellant beat, pushed, and abused her. Appellant served time in jail for the
offenses and testified that he "felt humiliated" because he was "very good to
[Bridges]," and he "didn't think she should have done that" to him. However,
appellant said he forgave Bridges and decided to continue the relationship with her. 
With regard to his convictions for assault and interference with an emergency
telephone call, appellant claimed he was innocent, and he only pleaded no contest so
that he could get a lighter sentence.

 Appellant testified that between 2004 and 2007, he and Bridges did not have
any problems. He claimed that problems began when Bridges got a video phone
because she used the phone constantly, abandoning her duties to the children and
household. Appellant testified that he pleaded guilty to interference with public
duties, arising out of an incident on August 4, 2007. The conviction was for
appellant's refusal to leave the apartment and allow police and E.M.S. officers to talk
to Bridges. Appellant denied that he was inside the apartment and claimed he showed
up at the apartment after he found out an ambulance had arrived at his apartment. 
Appellant said he was only trying to find out what was wrong with his family, and the
officers would not talk with him. Bridges was transported to the hospital for
treatment that day. After he returned home from serving time relating to the August
4, 2007 offense, appellant claimed he received death threats from Bridges' friends. 

 The State called Bridges' stepbrother, Daniel Rios, during the sentencing
phase. Rios recalled the birthday party for appellant and Bridges' daughter, which 
took place on November 17, 2007, a week before Bridges' death. Rios testified that
he observed appellant drinking heavily and acting aggressively towards Bridges. 
Rios testified that Bridges appeared to be scared of appellant and moved towards Rios
for protection. Rios compared Bridges' behavior to a child fearful of punishment. 
Rios attempted to protect Bridges, and appellant pushed Rios out of the way in an
attempt to get to Bridges. A fight erupted between the two men. The police gave
appellant a citation, removed him from the apartment, and told him to stay away for
the night. 

 Appellant claimed that, at his daughter's birthday party on November 17, 2007,
he was not drinking and he never called his wife names, argued with her, yelled at
her, or attempt to push or strike her. Appellant said he told Bridges to turn the music
down, which lead to Bridges' friends "attack[ing] [him] in [his] house." The police
were called, issued appellant a citation, and forced appellant to leave Bridges'
apartment. The police officers took appellant to the home of his niece, Alma. 
Appellant testified he returned to Bridges' apartment the following day. 

 On Friday, November 23, 2007, two days before Bridges died, the police were
called to Bridges' apartment again. Appellant testified that one of Bridges' friends
called the police at her direction because she wanted to leave appellant and take the
children to Michigan. Appellant said that Bridges told the officers that appellant had
threatened her with a knife, but he explained he was just peeling an apple for their
daughter. Appellant testified Bridges wanted the police to arrest him so that she
could keep the children. As a result of that incident, appellant stayed at the home of
his niece, Alma, for two nights. 

 Appellant testified that, on the day Bridges was killed, the family was happy
and having fun together, even though he claims he knew at that point Bridges planned
to move away with the children. When questioned on cross-examination about the
two statements he gave to Deputy Quintanilla, appellant denied some of the things
that were recorded in the interview.

 In rebuttal, the State called Deputy James Cabrero, with the Harris County
Sheriff's Office, to provide rebuttal testimony regarding the incident on November
23, 2007. Without objection from appellant, Deputy Cabrero testified that he
responded to a call at Bridges' apartment on November 23, 2007 at around 8:18 p.m. 
Because Bridges was deaf and mute, the responding officers communicated with her
through the use of a video phone and by writing notes in a notebook appellant
identified as belonging to Bridges. At trial, Deputy Cabrero identified State's Exhibit
101 as Bridges' notebook that they used to communicate on November 23, 2007. 
Deputy Cabrero testified that Bridges appeared "angry" and "scared" at the time she
communicated with him by writing in her notebook. Bridges wrote to him about what
happened to her earlier before the officers arrived. As a result of the incident, Deputy
Cabrero asked appellant to leave the residence, and he agreed. Appellant told the
officers he was going to stay at the home of his niece, Alma, and allowed Deputy
Cabrero to speak with her. At several points during Deputy Cabrero's testimony,
appellant's counsel objected on grounds that the questions called for hearsay, but the
objections were overruled. 

 On redirect, the State offered the 12 pages of written notes between Deputy
Cabrero and Bridges. Appellant's counsel objected to the admission of the pages,
arguing that they contained hearsay. Specifically, appellant asserted at the bench
outside the hearing of the jury, "Hearsay. There's tons of hearsay." Then after taking
Deputy Cabrero on voir dire, appellant's counsel objected by saying, "Again, Judge,
I'm going to object to these pages coming in." The court overruled the objection and
admitted State's Exhibit 101, the 12 pages of writing between Deputy Cabrero and
Bridges. Following the admission of the pages, Deputy Cabrero read the contents of
the writing without objection from appellant. He read through the statements,
identifying which person was writing and explaining what he understood certain
notes to mean. The State and defense rested and closed after Deputy Cabrero's
testimony.

Discussion

 In three points of error, appellant argues that: (1) the trial court erred by
admitting the hearsay testimony and written statements by Bridges, (2) the trial court
erred in denying appellant's requested jury instruction on defense of third person, and
(3) the trial court failed to include a voluntariness instruction pursuant to Article
38.22, Section 6 of the Texas Code of Criminal Procedure, resulting in egregious
harm to appellant.

A. Admission of Bridges' Written Statements

 First, appellant contends that the trial court abused its discretion by overruling
his hearsay objections and admitting the written statements Bridges made to Deputy
Cabrero.

 1. Standard of Review

 We review a trial court's admission of evidence over objection under an
abuse-of-discretion standard. McCarty v. State, 257 S.W.3d 238, 239 (Tex. Crim.
App. 2008) (citing Zuliani v. State, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003)). 
The trial court abuses its discretion "only when the trial judge's decision was so
clearly wrong as to lie outside that zone within which reasonable persons might
disagree." Cantu v. State, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992). As long as
the trial court's decision was within the zone of reasonable disagreement and was
correct under any theory of law applicable to the case, it must be upheld. McCarty,
257 S.W.3d at 239; Cantu, 842 S.W.2d at 682. 

 Even if the trial court errs in admitting evidence, such error requires reversal
only if it probably caused the rendition of an improper judgment. Nissan Motor Co.
v. Armstrong, 145 S.W.3d 131, 144 (Tex. 2004). The complaining party must
demonstrate that the judgment turns on the particular evidence admitted. Id. An
erroneous admission is clearly harmless if it is cumulative of other evidence. Id. 
Further, "[a]n error [if any] in the admission of evidence is cured where the same
evidence comes in elsewhere without objection." Lane v. State, 151 S.W.3d 188, 193
(Tex. Crim. App. 2004).

 2. Hearsay

 Hearsay is an out of court statement offered to prove the truth of the matter
asserted. Tex. R. Evid. 801. Hearsay statements are not admissible unless they fall
under a recognized exception to the hearsay rule. Id. 802. To be properly admissible,
each level of hearsay must fall under an exception. Crane v. State, 786 S.W.2d 338,
354 (Tex. Crim. App. 1990).

 A hearsay exception exists for an "excited utterance," which is a statement
relating to a startling event or condition made while the declarant was under the stress
of excitement caused by the event or condition. Id. 803(2). "In determining whether
a hearsay statement is admissible as an excited utterance, the court may look at the
time that elapsed between the event and the statement, as well as whether the
statement was in response to a question; however, neither of those two factors is
dispositive." Mims v. State, 238 S.W.3d 867, 873 (Tex. App.--Houston [1st Dist.]
2007, no pet.) (citing Lawton v. State, 913 S.W.2d 542, 553 (Tex. Crim. App. 1995); 
Penry v. State, 903 S.W.2d 715, 750-51 (Tex. Crim. App. 1995)). The critical
determination in analyzing whether a statement is an "excited utterance" is whether
the declarant was still dominated by the emotions, excitement, fear, or pain of the
event or condition at the time of the statement. Id; Zuliani, 97 S.W.3d at 595-96. 
Recently, the Texas Court of Criminal Appeals clarified that the event about which
an excited utterance is made does not have to be the same event that caused the
declarant's excitement. McCarty, 267 S.W.3d at 238-40.

 Texas Rule of Evidence 107, the rule of optional completeness, is also an
exception to the hearsay rule. Tex. R. Evid. 107; Walters v. State, 247 S.W.3d 204,
217 (Tex. Crim. App. 2007). Rule 107 is "one of admissibility and permits the
introduction of otherwise inadmissible evidence when that evidence is necessary to
fully and fairly explain a matter 'opened up' by the adverse party." Walters, 247
S.W.3d at 217-18. The rule "is designed to reduce the possibility of the jury
receiving a false impression from hearing only a part of some act, conversation, or
writing." Id. The matter opened up by the adverse party need not be ordinarily
admissible. Parr v. State, 557 S.W.2d 99, 102 (Tex. Crim. App. 1977); see Walters,
247 S.W.3d at 217-18. The necessity of completeness will justify the introduction,
through the "open door," of extraneous offenses, hearsay, or other matter that would
otherwise be incompetent and inadmissible. Walters, 247 S.W.3d at 217-18; Evans
v. State, 643 S.W.2d 157, 161 (Tex. App.--Austin 1982, no pet.) (rebuttal testimony
admissible, even though it contains evidence of extraneous offenses); Ware v. State,
475 S.W.2d 282, 285 (Tex. Crim. App. 1971) (questioning by the appellant as to what
was or was not included in conversation precludes his hearsay complaint upon appeal
where State inquired in greater detail as to same conversation).

 3. Analysis

 On direct examination during the punishment stage, appellant testified that, a
few days before the murder, he and his wife experienced problems. Appellant said
he moved to the home of his niece, Alma, and slept there on the floor for two days. 
Appellant said he left Bridges' apartment and moved in with Alma at the request of
police officers, who were dispatched to Bridges' apartment on November 23, 2007. 
Appellant testified that Bridges had her friend call the police "[b]ecause she wanted
to take the children to Michigan . . . . She met some friends through the video
[phone]. She didn't know who they were because it had been just three months that
she had purchased the video phone. She was going to leave with these people. She
was going to take my children. And then, thank God, the police arrived that day, and
I was able to explain a little of what was going on [to the police officer]." Appellant
testified that he did not cause any injuries or touch Bridges that evening. On cross-examination, the State attempted to bring out the full story. In response to the
prosecutor's questions, appellant said that Bridges told the officers that appellant had
threatened her with a knife, but he stated he was just peeling an apple for their
daughter. Again, appellant testified Bridges was just looking for the police to arrest
him so that she could keep the children.

 In rebuttal, the State called Deputy James Cabrero, with the Harris County
Sheriff's Office. Without objection from appellant, Deputy Cabrero testified that he
responded to a call at Bridges' apartment on November 23, 2007 around 8:18 p.m.
Because Bridges was deaf and mute, the responding officers communicated with her
through the use of a video phone and by writing notes in a notebook appellant
identified as belonging to Bridges. At trial, Deputy Cabrero identified State's Exhibit
101 as Bridges' notebook. Appellant was present at the time when Deputy Cabrero
was attempting to communicate with Bridges. Deputy Cabrero testified that Bridges
appeared angry and scared at the time she communicated with him by writing in her
notebook. Deputy Cabrero testified that she wrote to him about what happened to her
earlier before the officers arrived. 

 On cross-examination, counsel for appellant brought out testimony that Bridges
told the officers that she was raped and assaulted but there were no visible signs of
injuries, such as bruises or visible wounds. Appellant's counsel also had Deputy
Cabrero confirm that Bridges told him that she wanted appellant out of the house and
in jail. Additionally, counsel asked, "[T]here was another person on the video phone,
her boyfriend Mike, correct?" Deputy Cabrero responded that he did not know
whether he was a boyfriend but confirmed there was another person on the video
phone. 

 On redirect, the State attempted to elicit testimony to give the full story of the
conversation with Deputy Cabrero, but appellant objected that he was testifying from
a writing that was not introduced into evidence. At that point, the State offered the
12 pages of written notes between Deputy Cabrero and Bridges. Appellant objected
to the admission of the pages, arguing that they contained hearsay. Specifically,
appellant asserted at the bench outside the hearing of the jury, "Hearsay. There's tons
of hearsay." Then after taking Deputy Cabrero on voir dire, appellant objected by
saying, "Again, Judge, I'm going to object to these pages coming in." The court
overruled the objection and admitted State's Exhibit 101, the 12 pages of writing
between Deputy Cabrero and Bridges. Following the admission of the pages, Deputy
Cabrero read the contents of the writing without objection from appellant. As he read
through the statements, he identified which person was writing and explained what
he understood certain notes to mean. 

 First, the written statements between Bridges and Deputy Cabrero fit under the
excited utterance hearsay exception. Tex. R. Evid. 803(2). The statements by
Bridges relate to a startling event: she writes that she was raped, hit, and threatened
with a knife that evening. Deputy Cabrero testified that the statements were made
while Bridges was scared and angry, and thus, it would be reasonable for the trial
court to infer that Bridges was under the stress of excitement caused by the event or
condition. Id. 803(2).

 Courts have long held that statements made to law enforcement officials can
be excited utterances, so long as they meet the other requirements of the exception. 
See Zuliani v. State, 97 S.W.3d 589, 596 (Tex. Crim. App. 2003). Often courts do not
reach the issue of whether a statement to police is an excited utterance because the
statements are often excluded as "testimonial" statements in violation of the
confrontation clause. See Davis v. State, 169 S.W.3d 660, 668-70 (Tex.
App.--Austin 2005), aff'd 203 S.W.3d 845 (Tex. Crim. App. 2006). However, if an
objection is not made on confrontation clause grounds, the "testimonial" character of
a statement does not preclude the statement from being admissible as an excited
utterance. Fischer v. State, 252 S.W.3d 375, 391 (Tex. Crim. App. 2008); see Rios
v. State, 263 S.W.3d 1, 6-7 (Tex. App.--Houston [1st Dist.] 2005, pet. dis'd)
(hearsay objection does not raise Confrontation Clause argument). We note that here,
no objection was made on confrontation clause grounds at trial, and the issue is not
argued on appeal.

 Appellant cites Moon v. State, which found that written statements of a witness
were as a matter of law not excited utterances. 44 S.W.3d 589, 594 (Tex. App.-Fort
Worth 2001, pet. ref'd). However, in Moon, the court found that the witness's oral
statements to the police officer just after he arrived were properly admitted as excited
utterances. Id. Also, the court in Moon explained that the written statements made
later by the witness were not excited utterances because the officer testified that the
witness "had calmed down a little bit" and "was not excited at the time she made
these statements." Id. 

 Appellant argues in his brief, "The deceased did not talk to Cabrero, but rather
calmly wrote down notes to him." (Emphasis added.) In making this argument,
appellant misstates the record. Deputy Cabrero testified that Bridges was "scared"
and "angry," and he never described her as calm. Appellant's argument ignores the
fact that Bridges was unable to communicate orally with Deputy Cabrero because she
was a deaf-mute, so they conversed through pen and paper. The written statements
made by Bridges are not akin to the official written statement given to police
regarding an incident in Moon. See id. Instead, the written statements were clearly
made to explain the situation to Deputy Cabrero. Thus, it would be reasonable for the
trial court to determine that the written statements by Bridges to Deputy Cabrero were
excited utterances because Bridges was still dominated by the emotions, excitement,
fear, or pain of the event or condition at the time of the statement. See Zuliani v.
State, 97 S.W.3d 589, 595-96 (Tex. Crim. App. 2003). (1) 

 In addition, the written statements by Bridges and testimony by Deputy
Cabrero were brought in during the State's rebuttal in the punishment phase after
appellant opened the door to the issue during his direct examination. Appellant told
only part of the story, leaving the jury with a false impression of the situation. Thus,
the trial court could have also found that it was appropriate to admit the evidence
under the rule of optional completeness. See Tex. R. Evid. 107; Walters v. State, 247
S.W.3d 204, 217-18 (Tex. Crim. App. 2008). 

 We overrule appellant's first issue.

B. Jury Charge

 In his second and third issues, appellant complains of errors in the jury charge. 
 Appellant argues that the trial court erred in denying his requested instruction on
defense of a third person. Additionally, appellant argues that the trial court failed to
include a voluntariness instruction, pursuant to Article 38.22, Section 6 of the Texas
Code of Criminal Procedure, which resulted in egregious harm to appellant.

 1. Standard of Review for Jury Charges

 A claim of jury-charge error is reviewed using the procedure set out in
Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). First, we determine
whether there is error in the charge. Ngo v. State, 175 S.W.3d 738, 743 (Tex. Crim.
App. 2005) (citing Middleton v. State, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003)). 
If error exists and appellant objected to the error at trial, reversal is required if the
error "is calculated to injure the rights of the defendant," which is defined to mean
that there is "some harm." Almanza, 686 S.W.2d at 171. If the error was not objected
to, it must be "fundamental" and requires reversal only if it was so egregious and
created such harm that the defendant "has not had a fair and impartial trial." Id. 
Under both standards, we look to the actual degree of harm in light of the entire jury
charge, the state of the evidence, including the contested issues and weight of
probative evidence, the argument of counsel and any other relevant information
revealed by the record of the trial as a whole. Id. 

 2. Refusal to Give Requested Instruction on Defense of Third Person

 During the charge conference, appellant requested a jury instruction on defense
of a third person. The trial court denied the request. In his second point on appeal,
appellant argues that the trial court erred by denying his requested instruction. 
Specifically, appellant argues that he put forth evidence at trial raising the issue of
defense of third persons, namely his children. 

 a) The Law

 A defendant has a right to an instruction on any defensive issue raised by the
evidence, whether that evidence is weak or strong, unimpeached or contradicted, and
regardless of what the trial court may think about the credibility of the evidence. 
Elmore v. State, 257 S.W.3d 257, 259 (Tex. App.--Houston [1st Dist.] 2008, no pet.);
Granger v. State, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999). The defendant has the
burden of producing some evidence to support a claim of self-defense or defense of
a third party. Zuliani v. State, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). A
defendant's testimony alone may be sufficient to raise defensive theory requiring
instruction. Elmore, 257 S.W.3d at 259; Pierini v. State, 804 S.W.2d 258, 260 (Tex.
App.--Houston [1st Dist.] 1991, pet. ref'd). The issue before the reviewing court is
not the truth of the defendant's testimony, rather it is whether, if the testimony is
believed, a case of self-defense [or defense of third person] has been made. Id. If
such testimony, viewed in a favorable light, does not establish a case of defense, an
instruction is not required. Id. In other words, when the evidence establishes as a
matter of law that force is not justified in defense, then no defense issue is required. 
Id. (citing Williams v. State, 35 S.W.3d 783, 785-86 (Tex. App.--Beaumont 2001,
pet. ref'd). 

 An actor is justified in using deadly force to protect another "[s]o long as the
accused reasonably believes that the third person would be justified in using deadly
force to protect himself." Hughes v. State, 719 S.W.2d 560, 564 (Tex. Crim. App.
1986). The actor must reasonably believe that his intervention is immediately
necessary to protect the third person. Id. (emphasis added); Tex. Penal Code Ann.
§ 9.32(a) (Vernon Supp. 2009), § 9.33 (Vernon 2003). The Texas Court of Criminal
Appeals held that the defense of third persons was not available to a defendant who
killed an assailant fearing for his family's safety, when the evidence showed that the
family members were in another part of the house from the location where the
assailant was killed. McDonald v. State, 597 S.W.2d 365, 367 (Tex. Crim. App.
1980).

 b) Discussion

 In this case, appellant argues that his two statements made to law enforcement
officers in recorded interviews raise the issue of defense of his children. In his first
statements, appellant said that he believed Bridges would kill his children if he did
not kill her first. When asked why he did not flee with the children, call the police,
or ask for help from a neighbor, he explained he could not leave the bedroom because
it would traumatize his children to see him bleeding. Appellant said in his interview
that Bridges never threatened the children, but explained, he thought she might hurt
them because Bridges stabbed him after he had taken care of her, so she might also
be willing to harm the children. When asked for a specific instance when she harmed
the children, appellant said Bridges "beat the boy" when disciplining him because he
was a "handful."

 According to appellant's statements, the children remained in another room
throughout the altercation. In his first statement, appellant claimed Bridges displayed
a knife in a room with the children. He said he asked her to leave and go into another
room because of the children, and she complied. In his second statement, he said that
she never left the bedroom with the knife, and she did not display the knife until the
two were alone in the bedroom. In both statements, appellant maintained that all of
the stabbing occurred when the two were alone in the bedroom and bedroom closet. 
Appellant stated that Bridges remained in the bedroom, holding the door to the closet
shut from the inside, while he left the bedroom and went to the kitchen to retrieve a
knife. When he returned with the knife, he pulled the closet door open and stabbed
Bridges in the back, which made her fall to the ground. He explained, "the devil and
all, [got] in [him]" when he saw the blood.

 Appellant's statements establish as a matter of law that his use of deadly force
was not justified in defense of a third person. Appellant's own testimony shows that
intervention was not immediately necessary to protect the third persons because the
children were in another room. See McDonald v. State, 597 S.W.2d 365, 367 (Tex.
Crim. App. 1980) (holding defense of third parties was not available to a defendant,
when facts showed that third parties were in another part of house from location
where assailant was killed). Moreover, the fatal blow was delivered to Bridges in her
back while she was in a closet, in a bedroom with the door locked. Even when
viewed in the light most favorable to appellant, the evidence does not show defense
of a third person. See Morgan v. State, 545 S.W.2d 811, 814-15 (Tex. Crim. App.
1977) (holding, where it appeared from defendant's own testimony that third person
was out of danger at the time he inflicted serious stab wounds on the victim,
testimony was insufficient to raise the issue of defense of a third person, and trial
court did not err in failing to charge on that issue). Thus, the trial court did not err
in denying the request.

 We overrule appellant's second issue.

 3. Failure to Include Voluntariness Instruction

 In his final issue, appellant claims he suffered egregious harm because the trial
court did not instruct the jury on the voluntariness of appellant's statements to police,
pursuant to Article 38.22, Section 6 of the Texas Code of Criminal Procedure.

 a) The Law

 A statement of an accused may be used as evidence against him if it appears
that it was freely and voluntarily made without compulsion or persuasion. Tex.
Crim. Proc. Ann. art. 38.21 (Vernon 2005). There are several theories that a
defendant may use to argue his statement was not freely and voluntarily made and
thus may not be used as evidence against him: (1) Article 38.22, Section 6 ("general
voluntariness"); (2) Miranda v. Arizona as codified in Texas Code of Criminal
Procedure Article 38.22, Sections 2 and 3; or (3) the Due Process Clause. Oursbourn
v. State, 259 S.W.3d 159, 179 (Tex. Crim. App. 2008). The theory of involuntariness
determines whether and what type of a jury instruction is appropriate. Id. 

 Article 38.22 of the Code of Criminal Procedure governs the admissibility of
an accused's written and oral statement that result from custodial interrogation. Id.
at 171. However, Section 6 of Article 38.22 applies to both an accused's custodial
and non-custodial statements, requiring that even non-custodial statements must be
voluntary to be admitted. Id. When a claim is raised under Article 38.22, a "general"
voluntariness instruction may be appropriate. Id. at 174. The types of "general"
instructions that may be appropriate include an Article 38.22, Section 6 voluntariness
instruction and an Article 38.22, Section 7 warnings instruction (regarding the
warnings required by Sections 2 and 3). Id. at 173. It is the defendant's
responsibility to delineate which type of "involuntariness" he is claiming so that the
judge can determine the appropriate instruction. Id. at 174. 

 A trial court has the absolute duty to prepare a jury charge that accurately sets
out the law applicable to the case. Oursbourn, 259 S.W.3d at 179; see Tex. Crim.
Proc. Ann. art. 36.14 (Vernon 2007). When a statute, such as Article 38.22, requires
an instruction under certain circumstances that instruction is "law applicable to the
case," and the trial court must instruct the jury of what is required under the statute. 
Oursbourn, 259 S.W.3d at 180.

 If an issue of voluntariness is raised, Article 38.22, Section 6 requires that the
trial judge make an independent determination in a hearing outside the presence of
the jury that the statement was made under voluntary conditions. Id. at 175. If the
judge determines the statement was voluntary, it should be admitted, and a party may
offer evidence before the jury suggesting that the confession was not in fact
voluntary. Id. If such evidence is offered before the jury, the trial judge must
instruct the jurors that they shall not consider any statement for any purpose unless
they believe beyond a reasonable doubt that the statement was made voluntarily. Id.
The proper instruction to be given under Article 38.22, Section 6 is as follows:
"unless the jury believes beyond a reasonable doubt that the statement was voluntarily
made, the jury shall not consider such statement for any purpose nor any evidence
obtained as a result thereof." Id.

 The Court of Criminal Appeals has clarified that, if the parties raise and litigate
a general voluntariness issue before the trial judge, then a Section 6 instruction
becomes the law applicable to the case, and the trial court must give the instruction
regardless of whether it has been specifically requested. Id., at 176, 180. However,
when an appellant is entitled to a Section 6 instruction, but did not request such
instruction, we review the effect of the instruction's omission under Almanza's
egregious harm standard. See id. at 182 & n.89 (citing Ellison v. State, 86 S.W.3d
226, 228 (Tex. Crim. App. 2002)); see also Almanza v. State, 686 S.W.2d 157, 171
(Tex. Crim. App. 1985). 

 b) Error

 At trial, appellant challenged the admissibility of his two statements given to
police. Appellant filed a motion to suppress which, among other claims, asserted that
his statements were involuntary. In his motion, appellant cited to Article 38.22,
Section 6, and requested that the court hold a hearing outside the presence of the jury. 
At the hearing, the trial court denied relief, concluding that both statements were
voluntarily given. The statements were translated into English and read to the jury
at trial. Additionally, the redacted audio recording of the first interview and a video
of the second interview were admitted into evidence. 

 Because appellant raised and litigated the issue of voluntariness under Article
38.22, Section 6, the instruction became law applicable to the case, and the trial court
had an absolute duty to prepare a jury charge that accurately set out the law. See
Oursbourn, 259 S.W.3d at 176, 179; see also Tex. Crim. Proc. Ann. art. 36.14
(Vernon 2007). The trial court prepared a charge for the jury that included
voluntariness instructions under Articles 38.21, 38.22 (Sections 2 and 3), and 38.23. 
The charge did not, however, include the language of Article 38.22, Section 6. 
Because the trial court had an absolute duty to include the Article 38.22, Section 6
instruction after the issue had been raise, the trial court erred by not accurately setting
out the law. See Oursbourn, 259 S.W.3d at 176, 179.

 c) Harm Standard

 At the charge conference, appellant requested an instruction for aggravated
assault and defense of third person, which were denied. The charge prepared by the
trial court and discussed at the charge conference did not contain the exact language
of Article 38.22, Section 6. The court asked appellant's trial counsel, "Mr. Castro,
other than those that you've already enunciated, any [objections]?" Appellant's trial
counsel responded, "That's it, Judge."

 The trial court was required to give the instruction regardless of whether it was
specifically requested. See Oursbourn, 259 S.W.3d at 176, 180. However, appellant
concedes that he failed to make an objection or a request at the charge conference
relating to the Article 38.22, Section 6 voluntariness instruction. Thus, as conceded
by appellant, the applicable harm standard is egregious harm. See id. at 182 & n.89
(citing Ellison v. State, 86 S.W.3d 226, 228 (Tex. Crim. App. 2002)); see also
Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). 

 d) Egregious Harm

 Appellant argues that he meets the egregious harm standard because the jury
was without guidance regarding how to evaluate appellant's statement if it found the
statements to be involuntary. We disagree.

 Under the Almanza "egregious harm" standard, we reverse only if the error in
the omission of a required instruction caused the defendant to be denied "a fair and
impartial trial." Oursbourn, 259 S.W.3d at 182 (citing Almanza, 686 S.W.2d at 171). 
In other words, an error is "egregiously harmful" if it affects the very basis of the
case, deprives the defendant of a valuable right, or vitally affects a defensive theory. 
Stuhler v. State, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007) (citing Hutch v. State,
922 S.W.2d 166, 171 (Tex. Crim. App. 1996)). "Egregious harm" is present when the
prosecution's case was actually made clearly and significantly more persuasive by the
error. See Saunders v. State, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991). 

 In our egregious-harm review, we consider the entirety of the jury charge itself,
the evidence, including the contested issues and weight of the probative evidence, the
arguments of counsel, and any other relevant information revealed by the trial record
as a whole. Stuhler, 218 S.W.3d at 719. In conducting the analysis, we place no
burden of proof or persuasion to show egregious harm on either party. See Warner
v. State, 245 S.W.3d 458, 464 (Tex. Crim. App. 2008). Before we can find egregious
harm, "the record must show that the defendant has suffered actual, rather than merely
theoretical, harm from the jury-charge error." See Almanza, 686 S.W.2d at 174. We
determine whether an appellant suffered egregious harm by analyzing the impact of
the omission of the voluntariness instruction, not by analyzing the impact of the
admission of the evidence. See Ellison, 86 S.W.3d at 228.

 First, we look to the entire jury charge. See Allen v. State, 253 S.W.3d 260,
264 (Tex. Crim. App. 2008). While the charge did not contain the exact wording of
Article 38.22, Section 6, the charge taken together, contained language that gave the
jury guidance on how it should address a statement it found to be involuntarily given. 
The instruction given pursuant to Article 38.21 informs the jury that it should
consider a statement by appellant as evidence if it was "freely and voluntarily made
without compulsion or persuasion." Although this sentence did not include the
burden of proof specifically related to the voluntariness issue, the remaining
instructions explained that if the jury had reasonable doubt as to whether evidence
was obtained in violation of the law, it should wholly disregard the evidence. The
instructions when read as a whole conveyed essentially the same idea as the Article
38.22, Section 6 instruction. Nothing in the record indicates that the jury did not
follow the instruction given by the court.

 Appellant argues that the fact that, during deliberations, the jury requested the
medical records and recordings of appellant's statements shows that the jury
questioned the voluntariness of the confession. Appellant argues that this "alone
shows that appellant was deprived of a fair and impartial trial." We disagree. The
fact that the jurors considered such things tends to show that they took into
consideration how appellant's mental state might affect his ability to voluntarily make
a statement. The jury's verdict shows the jury was not convinced by appellant's
argument.

 Next, we look to the state of the evidence. The voluntariness of appellant's
statements was a contested issue at trial. At trial and on appeal, appellant argues that
he was medicated when he was interviewed at the hospital on November 26, 2007 at
3:22 a.m. However, he offered no medical testimony regarding the effects the drugs
might have on a person's ability to voluntarily make a statement. Instead, appellant's
counsel argued in closing the jury should use "common sense" to decide whether
appellant would be able to give a voluntary statement while on medication.

 Before speaking with appellant at the hospital, the deputies spoke with the
attending nurses, and the deputies ascertained that appellant was not under sedation
and that he was able to speak with them. At the time of the first interview, appellant
was not under arrest for a crime. The deputies stated that appellant was asleep when
the officers entered the room to speak with him, and he initially appeared drowsy, but
no other evidence was presented that supported his claim that he was not acting freely
or voluntarily. See Jones v. State, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996)
(holding that "[i]ntoxication, while relevant, does not render a confession involuntary
per se. Instead the question becomes whether the defendant's intoxication renders
him incapable of making an independent, informed decision to confess."). The two
officers who interviewed appellant testified that he seemed to be alert and to
understand to the questions. 

 Similarly, the officers testified that appellant was alert and freely answered
questions at the second interview. The officers testified that they did not coerce
appellant in any way, appellant was given his rights, and appellant freely and
voluntarily provided a statement. While appellant offered his own testimony at the
hearing, outside the presence of the jury, that he did not understand his rights and that
he was coerced by the officers to testify, no evidence was presented before the jury
during the guilt/innocence phase. Appellant did not testify during the guilt/innocense
phase of the trial. In the recording of the second interview, appellant appeared to be
acting freely and voluntarily. 

 In closing argument, counsel for appellant argued that appellant could not
voluntarily make a statement at the time of the second interview because he was still
medicated. However, no medical records were produced showing he was still on
medication at the time of the second interview. The medical records produced by
appellant ended on a date prior to the second interview. Nevertheless, counsel for
appellant argued in closing, "He was under medication still, as is evident by the need
to be drinking water. He needed that water for the medication." Deputy Quintanilla
testified at trial that, to the best of his knowledge, appellant was not under the
influence of any narcotic drugs or alcohol at the time of the second interview.

 In his closing argument, appellant's trial counsel argued that the jury must
decide whether appellant freely and voluntarily gave the statements. Counsel listed
the medications from the medical records, and asked the jurors to determine based on
their personal experiences whether they believed such medications could have
affected appellant's ability to describe the events. Because of the great deal of time
counsel spent explaining and arguing that the statements were involuntary, the issue
was clearly brought to the jury's attention. 

 Furthermore, while appellant claims that the two statements were involuntary
and should have been excluded, he utilized the statements as his primary defense at
trial contending that they showed he did not plan to kill Bridges and that he acted in
defense of himself and his children, or alternatively, that he acted in sudden passion. 
The two statements are the only source of evidence supporting appellant's self-defense and defense of third person theories.

 Even without the statements, evidence adduced at trial connected appellant to
the murder and supported the jury's verdict. The medical records indicated appellant
stabbed his wife and then himself. The tape of the 911 call placed by Alma also
indicated that appellant had stabbed his wife, killing her, and had then tried to kill
himself. Medical testimony was given showing that Bridges died from eleven stab
wounds, most of which she suffered to the back of her body.

 The failure to include the Article 38.22, Section 6 instruction did not "affect
the very basis of the case, deprive the defendant of a valuable right, or vitally affect
a defensive theory." See Stuhler v. State, 218 S.W.3d 706, 719 (Tex. Crim. App.
2007) (defining "egregious harm"). Therefore, we conclude that the failure did not
result in egregious harm to appellant.

 We overrule appellant's third issue.




Conclusion

 We affirm the judgment of the trial court.

 

 

 George C. Hanks, Jr.

 Justice


Panel consists of Justices Keyes, Alcala and Hanks.

Do not publish. See Tex. R. App. P. 47.2(b). 
1. While the statements by Deputy Cabrero are not excited utterances, appellant does not
complain about those statements on appeal.